[Civ. No. 14038. First Dist., Div. Two. Sept. 7, 1949.]

Estate of WILFRID JOSEPH LA BELLE, Deceased. MINERVA C. BIRNIE, Respondent, v. ELIZABETH M. LA BELLE, Appellant.

Sherman & Peters for Appellant.

Charles H. Baldwin and Norman A. Gregg for Respondent.

GOODELL, J.—A petition was filed by respondent, the daughter of the testator, for a decree determining interests in the estate, in which she named appellant, testator's widow, as an adverse claimant. Findings were made determining that all the estate was separate property and that respondent was entitled to the whole thereof. A decree was entered accordingly and this appeal was taken.

Shortly after testator's death appellant petitioned for a family allowance. The transcript of that hearing was used in the proceedings for the determination of interests and by

stipulation it is part of the record on appeal. Later appellant sued respondent seeking to establish that the tavern business now in question was a partnership between appellant and decedent, and the transcript of that trial was likewise used in said proceedings and by stipulation it is part of this record on appeal.

Wilfrid J. La Belle died on March 2, 1947, leaving a will dated September 10, 1946. He left a widow, the appellant Elizabeth M. La Belle, and a daughter by a former marriage, the respondent Minerva C. Birney. He left also three sisters and a brother, none of whom was named in the will. The will named respondent as executrix and she was appointed as such.

Testator devised and bequeathed to appellant the family home in Richmond, California, and half the community property.

He devised and bequeathed to respondent his place of business, a tavern known as ''Tom's'' in Richmond, together with all his separate property real and personal, also half the community property.

Testator and appellant married on January 10, 1943. At that time he owned and operated a tavern in Richmond known as ''The Harbor.'' He disposed of that and in May, 1943, purchased the tavern known as ''Tom's'' on San Pablo Road, for which he paid $8,500, all from his separate property. For this $8,500 he acquired the real property in which the tavern was located, the liquor license, the furnishings and fixtures, stock in trade and good will. Title to the real property was taken in the names of both spouses as joint tenants.

Four years later the inheritance tax appraiser valued the real property so acquired at $25,000, the liquor license at $10,000, the furnishings and fixtures at $5,000, and the stock in trade at $22,000, a total of $62,000.

The real property in which the tavern is situated has become vested in appellant, as the surviving tenant, and is not part of the subject-matter of this controversy. Its rental value is somewhere around $175 or $200 a month.

The subject-matter of this litigation is the tavern *business*, found by the court to have been separate property and bequeathed to respondent. As a matter of fact the license is not in litigation, for by express concession ''Appellant does not claim any community interest in the liquor license purchased with decedent's separate property and still used in the business.'' However, she ''earnestly contends that the other assets in the estate are community property to the extent

that they exceed reasonable interest on decedent's separate property investment."

That the business was exceedingly profitable is manifest.

Shortly after the purchase the testator instructed appellant how to keep a simple set of bookkeeping records, the figures of which were supplied from time to time to an accountant employed on a part-time basis. At the hearings no consecutive or systematic showing was made of the net profits of the business from its inception to the time of death, but it was shown by appellant's testimony that the gross receipts for the last six months of 1946 were: July, $2,976.03; August, $2,655.25; September, $2,913.10; October, $2,589.08; November, $2,825.59, and December, $2,682.16. It also appeared that on appellant's application for family allowance she filed an affidavit showing that in 1946 the gross sales were $33,914.74, that income from music, etc., was $5,602.35, making a total of $39,517.90, with expenses of $16,666.62, leaving a net profit of $22,850.47 for that year.

The business had a checking account at First National Bank of Richmond in the joint names of the spouses. Testator had this account before marriage and it was stipulated that at the time of the marriage there was $5,988.46 therein.

Appellant had an account of her own in American Trust Company in Berkeley which she had had long before her marriage to La Belle. She had opened it while she was Mrs. Elizabeth M. Kimberly and never changed it from that name.

Appellant testified that when she married La Belle she owned a piece of property which yielded $75 (later $100) a month rental, and stock which brought in $2.50 a month in dividends. This income she deposited in her Kimberly account. However, before her daughter was married appellant gave her $100 a month for her support.

At the time of the marriage of appellant and La Belle on January 10, 1943, there was between $300 and $600 in her Kimberly account.

A few days after La Belle's death on March 2, 1947 there was $16,675 in appellant's Kimberly account, when she closed it out. Practically all this came out of the business with the exception of the deposits of $77.50 to $100 a month which came from her separate property (out of which she paid the $100 a month to her daughter part of that time).

The $16,675 balance had been built up by the accumulation of deposits made by appellant averaging about $600 a month, which was her share of the profits of the tavern busi-

ness according to her testimony. Appellant testified that such $600 withdrawals constituted her monthly household allowances and spending money and that her husband knew of such withdrawals. To the question "In other words, you would take it out of the cash drawer and deposit it?" She answered, "Yes, the same as he took his money out."

On the same subject she further testified: "Q. Now Mrs. La Belle, you testified earlier that you received a share of the profits in the business? A. Yes. Q. And where did you deposit your share of the profits? A. In my Kimberly account. . . . The Court: What percent of the profit did you get? A. Just when we needed some money. The Court: What percent? A. I can't tell. . . . Q. Mrs. La Belle, so far as you know did you receive a greater or smaller share of the profits from Tom's than Mr. La Belle? . . . A. *I think it is just about the same.*" (Emphasis added.)

Neither spouse drew any salary from the business.

During the four-year period the parties bought a home on San Pablo Dam Road in Richmond for $15,000. It was stipulated at the trial that its value had increased to $25,000. This, too, was held in joint tenancy and became the sole property of appellant as surviving tenant. The record is not clear how much money came out of the business to pay for this home. Appellant testified that she sold 100 shares of Union Carbide stock (which was her separate property, apparently owned before marriage) for something under $8,000 and used the proceeds to pay off a loan on the home. In addition to that it would seem that money taken from the profits of the business also went into the home. She was asked: "Well, how much did you put in the bank and how much did you put in the ranch?" and answered: "We put everything we made, with the exception of what it cost to sell it, we put on that loan . . . On the home . . ." From this it would appear that money taken from the business was used to pay off the loan on the home. How much does not appear.

In July, 1945, the La Belles acquired a vacant lot adjoining the "Tom's" property, for which $2,000 was paid out of the business funds. This property was bought after appellant had proposed and urged its purchase, her husband having been slow to accede. Title, as in the other two instances, was taken in joint tenancy and it is now appellant's as surviving tenant.

Improvements were made to the place. A fireplace was built in and a new bar and back-bar were installed.

From the beginning appellant took an active interest in the business and according to her testimony put in long hours at the place, at times even helping out behind the bar. During the last few months of decedent's life when he was ill and in the hospital she put in much time at the place, and he seldom went there. For a part of the time before decedent's illness they lived in the living quarters in the place.

Appellant, in disclaiming any community interest in the liquor license "earnestly contends that the other assets in the estate are community property to the extent that they exceed reasonable interest on decedent's separate property investment." She relies on such cases as *Pereira* v. *Pereira*, 156 Cal. 1 [103 P. 488, 134 Am.St.Rep. 107, 23 L.R.A. N.S. 880], *Estate of Gold*, 170 Cal. 621 [151 P. 12], and *Estate of Fellows*, 106 Cal.App. 681 [289 P. 887].

In discussing the Pereira case in *Estate of Gold, supra,* Justice Shaw, the author of the Pereira opinion, says: "The principle there stated is that the interest of the husband in the capital of the partnership, as it was at the time of his marriage, is the husband's separate property, and that the question what part of the subsequent profits arises from the use of this capital, and what part from the personal activity, ability, and capacity of the husband, is to be determined by the court from the circumstances appearing in the case, that whatever accrues from the latter source is community property, and that the remaining profits must be classed as separate estate."

The extraordinary circumstances in the case at bar led the court to the conclusion that all the estate was decedent's separate property. The question for decision is whether that finding is supported by the evidence.

Respondent states the question as follows: "The question is whether or not the trial court was justified on such a showing, in concluding, as it did, that appellant who as surviving joint tenant received the real property on which the business is conducted, worth twenty-five thousand ($25,000.00) dollars; the adjoining realty, worth two thousand ($2000.00) dollars; the home worth in the neighborhood of twenty-five thousand ($25,000.00) dollars; plus one-half ($\frac{1}{2}$) of the remaining profits, six hundred ($600.00) dollars per month being taken by her from the till, had already received a share of the profits greater than should be attributed to the individual exertions of the parties and hence community property."

We agree with this statement and are convinced that the question must be answered in the affirmative.

The cases on which appellant relies are based, of course, on the premise that as said in *Dunn* v. *Mullan,* 211 Cal. 583, 590 [296 P. 604], the "right of reimbursement is granted to the wife upon the theory that to permit a husband to appropriate the community property under his management to his own separate use operates as a constructive fraud upon his wife. (McKay on Community Property, 2d. ed., sec. 1017, p. 661.) The reason underlying this distinction is well expressed in *Provost* v. *Provost,* 102 Cal.App. 775 [283 P. 842]. In that case findings had been made by the trial court that the husband after improving his separate property at the expense of the community had deeded the property to a daughter by a prior marriage for the fraudulent purpose of depriving his wife of her right to separate maintenance, and it was held therein that the wife through proper proceedings and pleadings had a right to compensation in the amount of her share in the community, measured by the improvement that such property had effected in his separate property."

In the instant case the decedent took title to all three pieces of real property in joint tenancy and *appellant now owns all three.* In this connection it should be noted that the assets upon which appellant seeks to impress to some extent a community character are the furniture and fixtures valued at $5,000 and the stock in trade valued at $22,000. The nucleus of these assets was the real and personal property bought by decedent for $8,500 with admittedly separate funds in May of 1943. Manifestly the most valuable unit of such nucleus was the real property, which was put at once into joint tenancy. From the time of the purchase in May, 1943, to the death in March, 1947, this real property, *which housed the profitable tavern business,* clearly remained the most valuable capital asset of that business. Because of such ownership the business was rent-free for the four years which meant, of course, (the rental value being approximately $200 a month) more profits were available for withdrawal. Appellant profited largely by this during that four-year period. On decedent's death the real property, which theretofore had been the most valuable capital asset of the business, went immediately to appellant as the surviving joint tenant and was lost to the business. It was valued by the inheritance tax appraiser at $25,000. Appellant thus became *sole owner of the major part of the capital itself* worth almost treble the $8,500 originally

paid by her husband out of his separate property for the whole thing—*real property and business*. Despite this, and despite the $16,675 fund in appellant's possession and the $2,000 lot, and the money (from the profits) which went into the home, she now invokes *a rule designed to protect wives who have been defrauded by their husbands*.

In *Estate of Wooten,* 64 Cal.App.2d 96, 101, 102 [148 P.2d 33], this is said: "The rule allowing reimbursement to the wife of community funds expended upon the separate estate of the husband appears to apply only in cases where such application or expenditure has been made *without the wife's consent.* This is plainly indicated by the language in *Wheeland* v. *Rodgers,* 20 Cal.2d 218 [124 P.2d 816], in *Dunn* v. *Mullan,* 211 Cal. 583, 590 [296 P. 604], and in *Provost* v. *Provost,* 102 Cal.App. 775 [283 P. 842]. It has in effect been stated that the basis for allowing such reimbursement is to prevent a husband in his control of the community property from taking advantage of his position by divesting the wife of her interest. (See *Provost* v. *Provost, supra,* p. 781.) The Provost case, *supra,* also clearly indicates that *the wife may agree to the application of community property to the separate estate of the husband and that the community property should become a part thereof.*" (Emphasis added.)

*Estate of Wooten* was cited on this point by respondent but in appellant's reply brief no attempt is made to challenge or distinguish it.

From appellant's own testimony it appears that soon after "Tom's" was bought she took an active interest in the business. Her husband showed her how to keep the books and she did that work. She probably drew and signed most of the checks on the joint checking account for the business. She attended to laying out the cash for the bartenders on opening up, and she checked it on closing. She accompanied her husband when he purchased liquor and other merchandise and at times did the buying alone. She took the inventories of the stock in trade either with her husband or alone. It was she who urged the improvement in the physical furnishings by the installation of a fireplace, and a new bar and backbar, and she was active in approving the plans and designs for them. It was she, apparently, who decided that the business could stand the withdrawal, month after month, of her share of $600 and, as she testified, an equal sum by her husband. From all these facts the court could well have concluded that appellant knew practically as much about the

business as did her husband and that any money (assuming it had a community property character) which went back into the business either in paying for improvements or in increasing the stock in trade, went back with her complete and unqualified consent. The court could likewise have concluded that this consent was given with the thought that the better equipped and more attractive the place, the better the business; the larger and more varied the stock on hand, the larger the sales, and the larger the sales the larger would be the profits in which appellant would take her share, not by asserting her rights later on by litigation, but then and there, month by month, as the practice in this case demonstrates. If ever there was a case where consent—more than that *active participation*—was shown, this case is it. "He who consents to an act is not wronged by it." (Civ. Code, § 3515.)

There is overwhelming evidence to support the findings and decree.

The decree is affirmed.

Dooling, J., concurred.