[Civ. No. 29730. First Dist., Div. One. Dec. 8, 1972.]

In re the Marriage of MARY and EDWARD W. JAFEMAN.
MARY JAFEMAN, Appellant, v.
EDWARD W. JAFEMAN, Appellant.

## Counsel

Roy A. Sharff for Appellant husband.

William A. Sullivan for Appellant wife.

## Opinion

**MOLINARI, P. J.**—Edward Jafeman (hereinafter "Edward") appeals from a judgment (dissolution of marriage) with the exception of that por-

tion decreeing a dissolution of his marriage to Mary Jafeman (hereinafter "Mary"). Mary appeals from an order denying an application for attorney's fees to resist Edward's appeal, with the exception of that portion of the order awarding the wife the actual costs of transcript and briefs.

*Facts*

Edward and Mary were married on May 13, 1951. They separated in October of 1968. There are no children from this marriage. Both have been employed throughout the years of their marriage. Mary has been employed in the same job since 1953 and has contributed to a pension fund.

At the time the parties were married Edward resided at 133 Hickory Lane in San Mateo. Mary lived across the street at 132 Hickory Lane. The residence at 133 Hickory Lane had been purchased by Edward and his former wife in 1942 for $6,500. Following his divorce from his first wife, Edward had the property put in his own name. At the time of his marriage to Mary, Edward owed $4,266.17 on the mortgage which existed on the property. Mary owed $3,701 on her residence.

Mary testified, without objection, that she had gone to the real estate offices of Fox and Carskadon and had examined their records pertaining to the sale of homes on Hickory Lane in 1951. She stated that the highest price paid for a home during that year was $14,500. Mary stated that, as the home at 132 Hickory Lane was identical to the home at 133 Hickory Lane, both were worth the same amount. Edward testified that, in his opinion, the home at 133 Hickory Lane was worth $18,000 at the time the parties were married. He stated that his opinion was based on the fact that another home on the block had been sold for $17,500 during that year.

Prior to their marriage the parties had discussed purchasing a new home as Edward's home only had two bedrooms and this was inadequate for Mary and her son and daughter by a previous marriage. However, Edward was fond of his home and since Mary's children were going to school in the neighborhood, they decided to live in Edward's house.

During the years of their marriage Edward and Mary commingled their personal earnings and the rental income from the property located at 132 Hickory Lane. Beginning in July of 1966, Mary's parents occupied the residence at 132 Hickory Lane rent free. During the first 12 years of the marriage, Mary handled all of the family's finances. In 1962 Edward and Mary experienced marital difficulties. The parties subsequently reconciled and thereafter Edward managed the family's finances. Following this period Mary and Edward each maintained separate savings accounts. Mary had an

account at the Peninsula Savings and Loan Association which had a balance of approximately $500 at the time of trial. Mary believed that the contents of this account were community property.

Mary and Edward never had any conversations respecting the ownership of the residence located at 133 Hickory Lane. Mary testified that she always referred to it as "our home" except when trying to differentiate it from the residence at 132 Hickory Lane. Mary did not know that the title to 133 Hickory Lane was in Edward's name only until shortly before filing for divorce. She stated that she had always thought it was "our property" and she had never checked the records at the courthouse.

During the years of the marriage, the principal and interest owing on the mortgage on 133 Hickory Lane, as well as all of the property taxes assessed against the property, were paid with money drawn from the commingled fund. Mary was asked if she had an opinion as to the present market value of the home. She testified, without objection, that she had obtained an estimate from Fox and Carskadon of $35,000 and that, in her opinion, this was the present fair market value of 133 Hickory Lane. She also testified that she had received an estimate of $32,000 for 132 Hickory Lane. It appears from the record that these estimates were written. Edward testified that Mary had obtained an oral estimate in 1968 and that it was $34,500 for 133 Hickory Lane and $34,000 for 132 Hickory Lane.

At the time the parties married, Edward's home was almost fully furnished. His former wife had taken a sofa, some end tables and a coffee table and the refrigerator. The remaining furniture was distributed to Mary's relatives and to a friend of her son. Edward estimated that he had paid $5,000 for the furniture. Mary then moved five rooms of furniture from 132 Hickory Lane over into 133 Hickory Lane. Mary had $1,500 which was used to recover some of the furniture, relay the carpets, and purchase paint.

During the first six months of the marriage Edward and Mary added a bedroom and a bathroom to the residence at 133 Hickory Lane. They also constructed a garden house and installed raised flower beds, a tile patio, and a fence. These additions cost approximately $4,700. Mary contributed $3,000 towards this amount which she obtained by refinancing the loan at 132 Hickory Lane, thus raising the indebtedness on that home to $6,700. The indebtedness of $3,000 resulting from the refinancing was paid off with money drawn from the spouses' commingled funds.

During the years of their marriage, Edward and Mary expended money drawn from their commingled funds for remodeling and redecorating the home at 133 Hickory Lane. They obtained two loans for these purposes.

The first loan was used for interior improvements in the dining room and living room, new linoleum in the kitchen and a new door, sliding glass windows, and new door fixtures. A portion of the loan was used for the purchase of a chandelier for the dining room and for a bedspread which was made to order. In 1964 they had $2,000 worth of carpet installed. In 1967 Edward and Mary obtained a loan of $3,500. They used this loan to convert a bedroom into a den, to hang new drapes in the bedroom, bathroom and den, to hang a new chandelier in the bathroom, to hang a chandelier in another room, to buy a marble top table for the kitchen, and to reupholster the breakfast nook set and put up wallpaper. Mary testified that during their marriage she and Edward purchased a sofa and some chairs at a cost of approximately $1,500. Mary estimated that their present value was about $400. Edward estimated that the cost of the fixtures and furniture in the home was between $8,000 and $10,000 and that they were currently worth one-half of their original cost.

During the course of the marriage, money from the parties' commingled fund was used for the improvement and maintenance of the residence at 132 Hickory Lane. Mary's father, and later Edward, painted the exterior and interior of the home several times. Edward installed a sprinkler system in the back yard and built a bench and a divider. Edward also replaced the door fixtures. The water heater was replaced twice and the furnace was repaired. The testimony respecting the cost of this work was in substantial conflict. In particular Edward contended that $700 was expended on paint, whereas Mary stated that $195 would be a reasonable figure. Edward contended that $3,000 was expended on plants and garden supplies, whereas Mary stated that $200 was probably spent for this purpose.

On October 15, 1968, Mary filed an action for divorce on the ground of extreme cruelty. Edward filed an answer and a cross-complaint for divorce on the ground of extreme cruelty. Mary filed an answer to the cross-complaint. The case was tried on December 22 and 23 of 1969.

On July 28, 1970, the court filed its findings of fact and conclusions of law. The findings which pertain to the issues raised upon this appeal may be summarized as follows: The court found that the residence located at 133 Hickory Lane is community property; that during their marriage the parties intended the home to be owned as community property; that although the question of title to the property was never discussed, it was Mary's belief that the home was community property and that she did not learn that title was not in their joint names until shortly before filing for divorce; and that each of the spouses was entitled to an undivided one-half interest in said residence.

The court also found that the furnishings which Mary had brought from "her separate property home at 132 Hickory Lane" and placed in the home at 133 Hickory Lane are community property and that each party was entitled to an undivided one-half interest in said furnishings; that the cash surrender value of Mary's pension fund and the contents of an account in her name at the Peninsula Savings and Loan Association are her separate property; and that additional attorney's fees in the sum of $1,200 should be paid by Edward to Mary's counsel.

The court concluded that the residence at 133 Hickory Lane and all of its household furnishings and furniture, as well as certain insurance policies, pension funds, and bank accounts are community property and should be divided equally after payment of community debts. The court concluded that Edward was to pay Mary's counsel the sum of $1,200 as attorney's fees, in addition to any allowance of counsel fees ordered pendente lite, plus costs in the sum of $12.60. The court did not include this sum as a debt of the community.

On July 28, 1970, the court entered an interlocutory judgment of dissolution of marriage. Following the filing of a notice of appeal by Edward, Mary filed a motion for attorney's fees and costs to resist the appeal. The court ordered Edward to pay only the actual costs of transcripts and briefs. Mary appealed from this order.

### Community Property Finding

Edward contends that the court's finding that the residence at 133 Hickory Lane is community property is not supported by substantial evidence. Upon considering the record before us in the light of the applicable legal principles, we have concluded that this contention is well taken and that the portion of the judgment awarding each party an undivided one-half interest in the residence must be reversed. However, we do not agree with Edward's further contention that the residence is wholly his separate property.

■ A finding that property owned by a married person is community property is a finding of an ultimate fact. (*Thomasset* v. *Thomasset,* 122 Cal. App.2d 116, 129 [264 P.2d 626] [disapproved on other grounds *See* v. *See,* 64 Cal.2d 778, 786 (51 Cal.Rptr. 888, 415 P.2d 776)].) Such a finding is binding upon an appellate court if it is supported by sufficient evidence or if it is drawn from evidence which is conflicting or subject to differing inferences. If the trial court has concluded that a presumption has been overcome, this determination will not be disturbed upon appeal if the evidence is in substantial conflict or is subject to varying inferences. (*Mears* v. *Mears,* 180 Cal.App.2d 484, 501 [4 Cal.Rptr. 618] [disapproved on other grounds

*See* v. *See,* 64 Cal.2d 778, 785 (51 Cal.Rptr. 888, 415 P.2d 776)]; *Millington* v. *Millington,* 259 Cal.App.2d 896, 915 [67 Cal.Rptr. 128]; *Patterson* v. *Patterson,* 242 Cal.App.2d 333, 339 [51 Cal.Rptr. 339] [disapproved on other grounds *See* v. *See,* 64 Cal.2d 778, 784 (51 Cal.Rptr. 888, 415 P.2d 776)].)

■ All property owned by a husband prior to marriage, together with the rents, issues, and profits arising from the property after marriage, is his separate property. (Civ. Code, § 5108;[1] *Patterson* v. *Patterson, supra,* 242 Cal.App.2d 333, 340; *Mears* v. *Mears, supra,* 180 Cal.App.2d 484, 498; *Kenney* v. *Kenney,* 128 Cal.App.2d 128, 135 [274 P.2d 951] [disapproved on other grounds *See* v. *See,* 64 Cal.2d 778, 785 (51 Cal.Rptr. 888, 415 P.2d 776)].) ■ The character of the property is fixed as of the time it is acquired and it is not altered by the occurrence of marriage or by the subsequent use of the property in the marital relationship. (*Mears* v. *Mears, supra,* at p. 498; *Kenney* v. *Kenney, supra,* at p. 135.) ■ However, a husband and wife may change the character of property from separate to community by an oral agreement. (*Woods* v. *Security-First Nat. Bank,* 46 Cal.2d 697, 701 [299 P.2d 657]; *Estate of Wieling,* 37 Cal.2d 106, 108 [230 P.2d 808].) No particular formalities are required for an effective agreement. (*James* v. *Pawsey,* 162 Cal.App.2d 740, 749 [328 P.2d 1023].) The agreement may be either express or implied. (*Mears* v. *Mears, supra,* at p. 499; *James* v. *Pawsey, supra,* at p. 749; *Dickson* v. *Dickson,* 225 Cal. App.2d 752, 756 [37 Cal.Rptr. 718].) ■ If the wife acquires possession of the property and manages and controls it, this does not in and of itself demonstrate that the husband intended to alter the character of his property. (*Title Insurance etc. Co.* v. *Ingersoll,* 153 Cal. 1, 5 [94 P. 94].) However, the nature of the transaction or the surrounding circumstances may establish the existence of such an intent on the part of the husband. (*Title Insurance etc. Co.* v. *Ingersoll, supra,* at p. 5; *Millington* v. *Millington, supra,* 259 Cal.App.2d 896, 913-914; *Long* v. *Long,* 88 Cal.App.2d 544, 549 [199 P.2d 47].) The acts of the parties and their dealing with the property may also establish that they intended a community interest. (*Estate of Nelson,* 224 Cal.App.2d 138, 143 [36 Cal.Rptr. 352]; *Lawatch* v. *Lawatch,* 161 Cal.App.2d 780, 789 [327 P.2d 603].)

■ Even in the absence of an agreement, separate property may be transmuted into community property if it is commingled with community property in such a manner that it is impossible to segregate. However, if it is possible to trace the separate property, it retains its character as separate

---

[1] All subsequent statutory references are to the Civil Code unless otherwise indicated.

property even though it may have undergone a change in form or identity. . (*Patterson* v. *Patterson, supra,* 242 Cal.App.2d 333, 341; *Mears* v. *Mears, supra,* 180 Cal.App.2d 484, 499-500; *Kenney* v. *Kenney, supra,* 128 Cal. App.2d 128, 135; *Thomasset* v. *Thomasset, supra,* 122 Cal.App.2d 116, 124.)

■ The use of community funds to improve the separate property of one spouse does not alter the separate character of the property. (*Spreng* v. *Spreng,* 119 Cal.App. 155, 159 [6 P.2d 104].) In the absence of a contrary agreement, the improvements have the character of the separate property and belong to its owner. (*Wheeland* v. *Rodgers,* 20 Cal.2d 218, 222 [124 P.2d 816].) ■ If the husband expends community funds for the improvement of his wife's separate property, it is presumed that he has made a gift of the community funds. However, if the husband expends community funds, without the consent of his wife, for the improvement of his separate property, the community is entitled to reimbursement. (*Dunn* v. *Mullan,* 211 Cal. 583, 590 [296 P. 604, 77 A.L.R. 1015].) These rules are both premised on the fact that the husband is the manager of the community funds. (See §§ 5125, 5127.) It is reasoned that when the husband exercises this power so as to effect the improvement of his separate property, recoupment by the community is necessary in order to avoid constructive fraud against the wife. (*Dunn* v. *Mullan, supra,* at p. 590; *Wheeland* v. *Rodgers, supra,* at p. 222.) This reasoning is inapplicable when the wife consents to the use of community funds for the improvement of the husband's separate property. If the wife's consent is established, the community is not entitled to reimbursement. (*Estate of La Belle,* 93 Cal.App.2d 538, 544-545 [209 P.2d 432]; *Estate of Wooten,* 64 Cal.App.2d 96, 101 [148 P.2d 33].)

■ If community funds are used to pay part of the purchase price on property acquired by one spouse prior to marriage, the property cannot be considered wholly community for the separate and community sources of the property can be traced. (*Estate of Neilson,* 57 Cal.2d 733, 744 [22 Cal. Rptr. 1, 371 P.2d 745].) The community has a *pro tanto* interest in such property in the ratio that the payments on the purchase price made with community funds bears to the payments made with separate funds. (*Estate of Neilson, supra,* at p. 744; *Bare* v. *Bare,* 256 Cal.App.2d 684, 689-690 [64 Cal.Rptr. 335]; *Forbes* v. *Forbes,* 118 Cal.App.2d 324, 325 [257 P.2d 721]; *Giacomazzi* v. *Rowe,* 109 Cal.App.2d 498, 501 [240 P.2d 1020]; *Vieux* v. *Vieux,* 80 Cal.App. 222, 229 [251 P. 640].) The community interest is determined by comparing the ratio of the community investment to the total separate and community investment in the property. If the fair market value has increased disproportionately to the increase in equity, the commu-

nity is entitled to participate in that increase in a similar proportion. (*Bare* v. *Bare, supra,* at p. 690.)

With these principles in mind, we turn to the facts of the instant case. Edward had acquired the residence at 133 Hickory Lane and had paid part of the purchase price prior to his marriage to Mary. It follows that Edward's initial equity in the home is his separate property. (§ 5108; *Patterson* v. *Patterson, supra,* 242 Cal.App.2d 333, 340; *Mears* v. *Mears, supra,* 180 Cal.App.2d 484, 498; *Kenney* v. *Kenney, supra,* 128 Cal. App.2d 128, 135.) Following the marriage of the parties, payments on the purchase price were made with community funds. As a result, the increase in the equity attributable to these payments is community property. (*Estate of Neilson, supra,* 57 Cal.2d 733, 744; *Bare* v. *Bare, supra,* 256 Cal.App.2d 684, 689-690; *Forbes* v. *Forbes, supra,* 118 Cal. App.2d 324, 325; *Giacomazzi* v. *Rowe, supra,* 109 Cal.App.2d 498, 501; *Vieux* v. *Vieux, supra,* 80 Cal.App. 222, 229.) As Edward and Mary each testified that they never discussed the ownership of the home, there is no basis in the record for concluding that Edward's initial equity in the home was transmuted into community property by an express agreement of the parties.

It is apparent that the trial court's finding that the residence is community property may be upheld only if the record presents substantial evidence of an implied agreement between the parties to alter the character of Edward's initial equity in the home. It is true that Mary and Edward lived in the home during their marriage. However, mere use of property in the marital relationship does not alter its character. (*Mears* v. *Mears, supra,* 180 Cal.App.2d 484, 498; *Kenney* v. *Kenney, supra,* 128 Cal.App.2d 128, 135.) It is also true that during the first 12 years of the marriage, Mary managed the family finances and applied community funds toward meeting the house payments and maintaining and improving the property. However, the use of community funds to improve the separate property of one spouse does not effect a change in the character of the separate property. (*Spreng* v. *Spreng, supra,* 119 Cal. App. 155, 159.) Moreover, the possession and management by one spouse of the separate property of another does not in and of itself demonstrate that the spouse to whom the property belonged intended to relinquish it to the community. However, such an intent may be shown by the nature of the transaction or by the surrounding circumstances. (*Title Insurance etc. Co.* v. *Ingersoll, supra,* 153 Cal. 1, 5.) In addition, the acts of the parties and their dealing with the property may establish that they intended a community interest. (*Estate of Nelson, supra,* 224 Cal.App.2d 138, 143; *Lawatch* v. *Lawatch, supra,* 161 Cal.App.2d 780, 789.) The

trial court apparently felt that these principles were applicable for it found that "upon the basis that after fourteen years of the aforesaid application of community funds, the clear import of the husband's conduct refutes his contention and affirms that of wife."

Turning to the record, the only evidence of conduct by Edward which related to the character of the property was testimony concerning the manner in which he referred to the residence. The testimony on this point was in conflict. Mary testified, without objection, that they always referred to the residence as "our home." Edward contended that they always distinguished between his house and Mary's house. The trial court was entitled to resolve this conflict by crediting Mary's testimony. ▆▆▆ Nevertheless, the mere fact that Edward referred to the residence as "our home" does not constitute substantial evidence of an intent to relinquish his separate interest in the property. (Cf. *Long v. Long, supra,* 88 Cal.App.2d 544, 549 [other comments by husband respecting the community character of other property]; *Lawatch v. Lawatch, supra,* 161 Cal.App.2d 780, 790 [commingling of funds and filing joint tax returns with respect to income from the property]; *Estate of Nelson, supra,* 224 Cal.App.2d 138, 143-144 [filing joint tax returns].)

The record does not contain any other evidence tending to show an implied agreement to alter the character of Edward's interest. Edward never had the title to the property put in both parties' names.

The only evidence on this issue adduced by Mary was her testimony that "I thought it was our property." Apparently, on the basis of this testimony, the court found "that although the question of title to 133 Hickory Lane . . . was never discussed, it was the belief of [Mary] that said property was community property of the marriage. [Mary] did not learn that title was not in their joint names . . . until shortly before filing the within action for divorce in October, 1968."

It has been held that testimony of the hidden beliefs of a party is ineffective to show that a joint tenancy deed is not reflective of the character of the property. (*Machado v. Machado,* 58 Cal.2d 501, 506 [25 Cal.Rptr. 87, 375 P.2d 55]; *Gudelj v. Gudelj,* 41 Cal.2d 202, 212 [259 P.2d 656]; *Socol v. King,* 36 Cal.2d 342, 346 [223 P.2d 627]; *Watson v. Peyton,* 10 Cal.2d 156, 158 [73 P.2d 906].) An analogous conclusion is warranted by the facts of the instant case. ▆▆▆ Although it might be found that testimony by a husband as to his undisclosed intent to transmute his separate property to community property has probative value, the same cannot be said of testimony by a wife as to her undisclosed beliefs respect-

ing her husband's property. Such testimony has no probative value as to the intent of the husband and it is not effective to show an implied agreement between the parties to alter the character of the husband's property.

The finding of the trial court that the residence at 133 Hickory Lane is community property is not supported by the evidence. In response to Mary's argument upon appeal, we note that *See* v. *See,* 64 Cal.2d 778 [51 Cal.Rptr. 888, 415 P.2d 776], in no way supports the finding of the trial court. In *See* the court held that a husband who elects to use his separate property to defray community expenses is not entitled to reimbursement from the community in the absence of an agreement to that effect. (At p. 785.) *See* was concerned with the use of separate funds during the course of the marriage for meeting ongoing community expenses. There is no indication that *See* was intended to affect the line of cases which recognize that a husband may maintain as separate property the equity which he possessed in the family residence prior to the marriage. (*Estate of Neilson, supra,* 57 Cal.2d 733, 744; *Bare* v. *Bare, supra,* 256 Cal. App.2d 684, 689-690; *Forbes* v. *Forbes, supra,* 118 Cal.App.2d 324, 325; *Giacomazzi* v. *Rowe, supra,* 109 Cal.App.2d 498, 501; *Vieux* v. *Vieux, supra,* 80 Cal.App. 222, 229.) *See* does not require that it be presumed that Edward intended to make a gift of his equity to the community.

As the finding of the trial court that the residence at 133 Hickory Lane is community property is not supported by the evidence, that portion of the judgment awarding each party an undivided one-half interest in the property must be reversed, and the matter must be remanded for further proceedings in order that the proportionate interests of the community and of Edward in the property may be ascertained.

In order to facilitate this determination it is appropriate to comment upon the effect of the expenditure of community funds for the improvement of the property. When community funds are expended for improvement of a husband's separate property, the community is entitled to be reimbursed only if the expenditure was made without the wife's consent. (*Estate of La Belle, supra,* 93 Cal.App.2d 538, 544-545; *Estate of Wooten, supra,* 64 Cal.App.2d 96, 101.) The record in the instant case is devoid of any finding as to whether Mary consented to expenditure of community funds for the improvement of the entire residence. The absence of such a finding is understandable in view of the posture in which the ownership and community character of 133 Hickory Lane was presented to the trial judge. Upon the remand the trial court is directed to make findings on the issue of consent, and if further evidence on this issue is necessary, in the trial court's discretion, to reopen the case for this purpose.

## Separate Property Findings

Edward contends that the court erred in finding that a savings account with the Peninsula Savings and Loan Association in Mary's name is her separate property. After having reviewed the record in the light of the applicable legal principles, we have concluded that this contention is well taken. ·

The earnings of a wife while living with her husband are community property. (§ 5110; *Romanchek* v. *Romanchek,* 248 Cal.App.2d 337, 342 [56 Cal.Rptr. 360]; *Sbarbaro* v. *Rosa,* 48 Cal.App.2d 584, 587 [120 P.2d 151]; *Smith* v. *Smith,* 47 Cal.App. 650, 652 [191 P. 60].) However, a husband and wife may mutually agree that the wife is to retain the earnings as her separate property. Such an agreement may be shown by evidence of acts and conduct on the part of the husband with respect to his wife's earnings indicating that he did not regard the wife's earnings as community property. (*Sbarbaro* v. *Rosa, supra,* 48 Cal.App.2d at p. 587; *Smith* v. *Smith, supra,* 47 Cal.App. at p. 652.)

In the instant case, the parties experienced marital difficulties approximately six years prior to the time Mary filed for divorce. Although the parties continued to live in the same house, they did not speak to each other for eight months. After the parties reconciled, each opened up his own savings account. Mary testified that the money in her account came from her earnings during her marriage. She testified that she assumed that the money in her account and in Edward's belonged to the community. Although the court found that the money in Edward's account is community property, it found that the money in Mary's account is her separate property.

As the money in Mary's account came from her earnings after the parties resolved their marital difficulties, it is clearly community property unless its character has been altered by agreement. The fact that the parties set up separate accounts is not in and of itself conclusive, as there is uncontradicted testimony by Mary that the money in each account belonged to the community. Mary has not directed our attention to any evidence to support the court's finding. Mary's only response to Edward's contention is that the court's finding was motivated by a desire to allow a setoff against cash and furniture which Mary had at the time of the marriage. This is in no way responsive to the issue whether there was an agreement to transmute the character of the savings. Given the state of the record, we conclude that the court erred in finding that the account is Mary's separate property. The trial court will be directed, upon remand of this case, to enter a finding that the account is community property and to modify its judgment accordingly.

 Edward also contends that the court erred in findings that Mary's pension is her separate property. We have concluded that the court's findings with respect to the pension are insufficient and we direct the court to make additional findings upon remand of this case.

The California Supreme Court has decided several cases which involved determination of the characterization of pension plans participated in by various public employees. (*Benson* v. *City of Los Angeles,* 60 Cal.2d 355 [33 Cal.Rptr. 257, 384 P.2d 649] [municipal pension plan]; *Phillipson* v. *Board of Administration,* 3 Cal.3d 32 [89 Cal.Rptr. 61, 473 P.2d 765] [Public Employees' Retirement System]; *Waite* v. *Waite,* 6 Cal.3d 461 [99 Cal.Rptr. 325, 492 P.2d 13] [Judge's Retirement Fund].) We find nothing in the facts of the instant case which precludes resort to these decisions in determining the characterization of Mary's pension plan. (Cf. *Wissner* v. *Wissner,* 338 U.S. 655 [94 L.Ed. 424, 70 S.Ct. 398].)

As stated above, a wife's earnings during marriage are community property. Similarly, both retirement contributions which are withdrawn from those earnings and employer contributions added in consideration of the employee's services are community property. (*Phillipson* v. *Board of Administration, supra,* 3 Cal.3d 32, 40; *Waite* v. *Waite, supra,* 6 Cal.3d 461, 469.) If the wife is entitled to withdraw the contributions upon terminating her employment prior to retirement or if her beneficiaries are entitled to receive the contributions upon her death, the court should include the accumulated contributions in evaluating and dividing the community property. (*Phillipson* v. *Board of Administration, supra,* at p. 41, fn. 8.) Retirement benefits, in contrast to the accumulated contributions, may be considered in dividing the community property only if the wife is presently entitled to receive them. (*Phillipson* v. *Board of Administration, supra,* at p. 39; *Waite* v. *Waite, supra,* at p. 469.) If the wife continues to be employed and the nature and value of the retirement benefits are contingent, the benefits are classed as an expectancy, and neither those rights nor their actuarial equivalent are divided or awarded as community property in a dissolution proceeding. (*Williamson* v. *Williamson,* 203 Cal.App.2d 8, 11 [21 Cal.Rptr. 164]; *Phillipson* v. *Board of Administration, supra,* at p. 41, fn. 8.)

The record discloses that Mary has been employed as a cashier-clerk for the California Water Service in San Mateo since 1953. During the course of this employment she has contributed to a pension plan. She acknowledged at the trial that her current contribution is $2.51 a month. Mary testified at the trial that she was 60 years of age and that it was mandatory for her to retire at age 65.

On the basis of the record before us we are unable to determine Mary's rights under the pension plan. The court below made no finding other than its general finding that the cash surrender value of the pension plan is Mary's separate property. It cannot be determined from this finding whether or not Mary is entitled to withdraw the accumulated contributions should she leave her job before retirement or whether or not her representatives are entitled to receive these contributions should she die before retirement. It is therefore appropriate to direct the trial court to make additional findings respecting Mary's rights under the pension plan. If the court finds that Mary does have the right to recoup the contributions should she choose to leave her job prior to retirement, then the court is further directed to include the contributions in evaluating and dividing the community property.

### *Attorney's Fees*

On July 9, 1970, at the time of the hearing on Edward's objections to the proposed findings and conclusions, Mary's counsel made a request for additional attorney's fees. On July 15, 1970, the court ordered Edward to pay Mary's counsel $300. This was in addition to $200 which Edward had been previously ordered to pay on account. In its findings of fact the court found that under the circumstances of the case Edward should pay Mary's counsel an additional fee of $1,200. The court made a similar conclusion of law. The interlocutory judgment is divided into numbered sections. Section two of the judgment provides that Edward shall pay Mary $125 a month for her support. Section three provides that Edward shall pay Mary's counsel $1,200 and states that this sum is in addition to any allowance ordered pendente lite or at any other time or times subsequent to the trial. The fourth section lists the community property and provides that each party is entitled to an undivided one-half interest in the property. It further provides that the property is subject to certain community debts. The attorney's fee owing to Mary's counsel is not included in the list of community debts.

Edward objects to that portion of the interlocutory judgment which provides that he pay Mary's counsel $1,200, and to the order of July 15, 1970, which provides that he pay $300. Edward contends that when a court orders the husband to pay counsel fees out of his half of the community property it violates the requirement in section 4800 that the community property be divided equally between the parties. Edward has not cited any authority to support his contention. His argument is that it is within the contemplation of the Family Law Act to divide community property equally, and that the deduction of attorney's fees from the

husband's half of the community property in the interlocutory decree has the effect of reducing his just portion of the community property. He contends that an award for attorney's fees made in the decree differs from a pendente lite award in that the latter is provided for before there is a division of the community property. Edward also makes the point that pendente lite the community property is in the possession and control of the husband who has access to it for his attorney's fees while the wife does not.

Mary directs this court's attention to section 4370 which provides for the allowance of costs and attorneys' fees pendente lite and argues that the law pertaining to the award of attorneys' fees had not been altered by the enactment of the Family Law Act. Section 4370, which became effective on July 6, 1970, is derived from section 4525, which had been operative since January 1, 1970. (§ 4370, added by Stats. 1970, ch. 311, § 1, p. 705.) Section 15 of the Statutes of 1970, chapter 311, page 706, referring to section 4370, provides, "This act does not constitute a change in, but is declaratory of, the existing law." Section 4525 substantially reenacted former section 137.3, with the exception of a provision relating to the enforcement of orders. (§ 4525, added by Stats. 1969, ch. 1608, § 8, p. 3328.)

Before considering the merits of Edward's argument, it is appropriate to note that the interlocutory judgment does not specify what property Edward is to resort to in meeting the obligation to pay Mary's counsel fees. However, the record discloses that Edward's separate estate, prior to the division of the community property, was minimal. The court did not specifically find any property to be Edward's separate property. We assume that Edward's GI insurance policy was found to be his separate property, as it is omitted from the list of community property. We have concluded above that Edward's original equity in the residence at 133 Hickory Lane is separate property. Nevertheless, for the purposes of our discussion, we will assume that Edward will have to resort to the property which he will have acquired by virtue of the division of the community property in order to satisfy that portion of the interlocutory judgment awarding attorney's fees.

As the Family Law Act provision for attorney's fees is substantially a reenactment of the previous provision, it is useful to begin by considering the decisions rendered under the former section and to then consider whether they have been invalidated by the requirement of the Family Law Act that the community property be equally divided.

The purpose of an allowance to a wife for counsel fees on ac-

count is to enable her to have sufficient resources to adequately present her case. (*Bernheimer* v. *Bernheimer,* 103 Cal.App.2d 643, 648 [230 P.2d 17]; *Avnet* v. *Bank of America,* 232 Cal.App.2d 191, 200 [42 Cal. Rptr. 616].) In order to be entitled to an award the wife must demonstrate that her resources are not sufficient to meet the expenses of litigation. (*Martins* v. *Superior Court,* 12 Cal.App.3d 870, 876 [90 Cal.Rptr. 898].) However, a wife is not required to impair the capital of her separate estate in order to defray her litigation costs. (*Bernheimer* v. *Bernheimer, supra,* at p. 648; *Avnet* v. *Bank of America, supra,* at p. 200.) Edward does not contend upon this appeal that Mary was not in need of funds in order to participate in the proceedings below.

In *Weinberg* v. *Weinberg,* 67 Cal.2d 557 [63 Cal.Rptr. 13, 432 P.2d 709], decided prior to the passage of the Family Law Act, both parties were awarded a divorce and thus the court was required to divide the community property equally. The court ordered that the husband pay the legal fees out of his separate property. The husband contended that these fees should have been charged against the community property before it was distributed. In rejecting this contention the reviewing court held that under former section 137.3 the trial court had discretion to order the payment of attorney's fees in such amount as may be reasonably necessary without regard to the available sources. (At p. 571.) The appellate court stated, moreover, that even if the wife had separate property in addition to community property she would not be required to resort to her own capital for payment of her own counsel before ordering her husband to pay attorney's fees. (At p. 571.)

The clear import of *Weinberg* is that even when the court is required to divide the community property equally, an award of attorney's fees may be made without regard to the character of the funds from which the payment may ultimately be made. This suggests that the award of attorney's fees is an independent matter and is not to be interjected into the consideration of division of the community property when an equal division is required.

It may be noted that at the time *Weinberg* was decided there was also in effect former section 141 which provided as follows: "In the enforcement of any decree, judgment or order rendered pursuant to the provisions of this article, the court must resort: 1. To the community property; then, 2. To the separate property of the party required to make such payments." A reading of these two statutes together did not, in view of the holding in *Weinberg,* militate against its conclusion that an award of attorney's fees is independent of the issue of an equal division of the community property. In the language of former section 141, an award of attorney's fees is

independent of the issue of an equal division of the community property, and an award of attorney's fees could be enforced by resort to the community property of the party required to make such payment. We note here that the provisions of former section 141 are now substantially incorporated in section 4805 of the Family Law Act.

We therefore conclude that prior to the passage of the Family Law Act an award of attorney's fees was independent of the division of the community property and was not in derogation of the parties' right, in those cases in which each was granted a divorce, to an equal division of the community property. We now turn to the provisions of the Family Law Act in order to determine if they have effected a change in the law.

Section 4800 provides that in all cases the court shall divide the community property equally. Section 4370 substantially reenacts the former section pertaining to the award of attorney's fees. Section 4502 provides that the superior court shall have jurisdiction to "make such orders as are appropriate concerning the status of the marriage, the custody and support of minor children of the marriage, the support of either party, the settlement of the property rights of the parties and the award of attorneys' fees and costs." Section 4805 provides that "In the enforcement of any decree, judgment or order rendered pursuant to the provisions of this part, the court must resort: (a) To the community property; then, (b) To the quasi-community property; then, (c) To the separate property of the party required to make such payments."

"The primary and controlling consideration in the construction of statutes is the determination of legislative intent. [Citation.] Statements in legislative committee reports concerning the statutory purposes which are in accordance with a reasonable interpretation of the statute will be followed by the courts. It will be presumed that the Legislature adopted the proposed legislation with the intent and meaning expressed in committee reports." (*In re Marriage of Paddock,* 18 Cal.App.3d 355, 359 [95 Cal.Rptr. 652].) The Assembly committee report on Assembly Bill No. 530 and Senate Bill No. 252 (The Family Law Act) indicates that the premise of the new legislation was "the elimination of the artificial fault standard." (Assem.J. (1969) p. 8057.) In discussing the requirement of equal division of the community property the report notes that such a division "is most important if acrimony is to be reduced or eliminated." (Assem.J. (1969) p. 8062.) Although the report does not discuss the award of attorneys' fees, it does discuss the award of alimony. After noting the factors which a court should consider before making such an award, the report states that women's "approaching equality with the male should be reflected in the law governing marriage dissolution and in the decisions

of courts with respect to matters incident to dissolution." (Assem.J. (1969) p. 8062.)

Although the report does not specifically concern itself with the issue before this court, it does provide some basic guides for our resolution of the issue. ▉ First, we note that the Legislature's primary intent in requiring an equal division of the property was to attempt to eliminate acrimony. This purpose is not thwarted by permitting an award of attorneys' fees. We cannot assume that a spouse will utilize his right to attorneys' fees to promote discord. Moreover, without the award of attorneys' fees a spouse who does not have the necessary funds to participate in the proceedings may be deprived of the equal share of the community property which the Legislature clearly intended he was to have. Secondly, the Legislature's expression of an intent that women not be accorded different treatment from men, does not indicate an intent to disallow attorneys' fees in an appropriate case. Rather, this only suggests that the same considerations must be invoked in making an award to either the husband or the wife.

▉ In resolving the issue before us we are guided by the principle that "Statutes should be construed so as to harmonize the various sections, and wherever possible seemingly conflicting provisions should be reconciled to avoid the declaration of an irreconcilable conflict." (*In re Marriage of Paddock, supra,* 18 Cal.App.3d 355, 359.) As we have already noted, the Family Law Act substantially reenacts the various former sections pertaining to the award of attorneys' fees. The new legislation specifically grants the superior court jurisdiction to award attorneys' fees. These sections can only be reconciled with the requirement of equal division of property by concluding that the Family Law Act did not effect a change in the previous case law. Such a conclusion seems warranted by the fact that even under the previous sections it was not found that an award of attorneys' fees was incompatible with the requirement of equal division of the community property.

▉ We therefore conclude that the trial court could properly award Mary attorney's fees and that its award was not in derogation of Edward's right to an equal share of the community property. That portion of the interlocutory judgment pertaining to attorney's fees must be affirmed.

▉ It should be noted here, however, that although an award of attorney's fees is independent of the division of the community property, a spouse's liability for his own attorney's fees may be considered in relation to the division of the community property under appropriate circumstances. In *Wong* v. *Superior Court,* 246 Cal.App.2d 541, 547 [54 Cal. Rptr. 782], it was recognized that the parties, by proper amendment of

their pleadings, may request that their liability to their respective attorneys be treated as a community debt. In such a situation it is proper for the court to consider this obligation, just as it would any other community debt which is not in dispute, in determining the amount of community property which is available for distribution. Similarly, where one spouse satisfies his liability to his own counsel by withdrawing funds from the community prior to the division of the property and the case is one in which an equal division is required, the court may direct that the other spouse receive a credit in order that the division be equal. (*Gilb* v. *Gilb*, 170 Cal. App.2d 379, 386 [339 P.2d 176].)

### *Equitable Distribution*

The interlocutory judgment merely lists the community property and declares that each party is the owner of an undivided one-half interest in the property. Edward contends that this does not constitute a division of the property as required by section 4800. Mary has made no reply to this contention and thus we assume that she agrees. ▮ Without determining whether section 4800 imposes a mandatory obligation upon the trial court to order a distribution of the community property, we have concluded that in the instant case it was error for the court to have failed to decree such a distribution.

We first observe that section 4800 clearly contemplates the possibility of a distribution of the community property. It specifically provides that the court is not precluded from awarding any asset to one spouse in order to effectuate a substantially equal division of the community property. The ability of the court to distribute the property is further confirmed by the Family Law Rules adopted by the Judicial Council. Rule 1242 provides that "The court in every case shall ascertain the nature and extent of all assets and obligations subject to disposition by the court in the proceeding and shall divide such assets and obligations as provided in the Family Law Act, except upon the written agreement of the parties or an oral stipulation of the parties made in open court. . . ."[2] It is well recognized in the cases that ascertaining the value of the assets of the community is a prerequisite to the distribution of the property. (*Elam* v. *Elam*, 2 Cal.App.3d 1013, 1017-1018 [83 Cal.Rptr. 275].) It is similarly well established that one of the duties of a court of equity in a divorce proceeding is to make an equitable distribution of the community property. (*Elms* v. *Elms*, 4 Cal.2d 681, 683-684 [52 P.2d 223, 102 A.L.R. 811].)

In the instant case, both Mary and Edward included in their pleadings

---

[2]Rule 1202 provides that the word "shall" is to be construed as mandatory.

a prayer for an equitable distribution of the alleged community property. During the trial evidence was presented as to the value of the property. The interlocutory judgment ascribes a value to all items determined to be community property, other than the residence at 133 Hickory Lane and its furnishings. "It is not within the discretion of the court to refuse to give judgment declaring a right which is properly pleaded and well established by the evidence. Where good grounds exist for the granting of legal or equitable relief, judgment is given to the party entitled thereto as a matter of right and not of grace. And in equity, in order to avoid unnecessary litigation, the court will, if possible, decide all controversies arising out of the matter in dispute, which is the foundation of the equitable action." (*Majors* v. *Majors,* 70 Cal.App.2d 619, 627 [161 P.2d 494].) We, therefore, conclude that under the circumstances of the instant case it was error for the court to have failed to decree an equitable distribution of the community property in response to the prayer of the parties. Upon remand the court will, therefore, be ordered to effect such a distribution.

### Attorney's Fees on Appeal

As noted above the trial court disposed of Mary's motion for attorney's fees and costs to resist Edward's appeal as follows: "Respondent to pay petitioner actual costs of transcript and briefs. Motion for Attorney fees may be renewed later." Mary filed a notice of appeal from all but that portion of the ruling awarding her actual costs of the transcripts and briefs.

Although an order respecting the payment of attorney's fees and costs pendente lite is appealable as a final judgment in a collateral matter, the court's ruling respecting Mary's request for attorney's fees upon appeal does not fall within this rule. As the court has reserved jurisdiction in order to further consider Mary's request, its ruling cannot be considered a final adjudication of the issue. The ruling is in the nature of an interlocutory order directing that further proceedings be taken before a determination is made. It is the duty of an appellate court to dismiss an appeal from a nonappealable order on its own motion. Accordingly, we conclude that Mary's appeal must be dismissed. (*Chapman* v. *Tarentola,* 187 Cal. App.2d 22, 25 [9 Cal.Rptr. 228].)

The appeal from the order denying Mary's application for attorney's fees to resist Edward's appeal is dismissed. That portion of the interlocutory judgment awarding and dividing the community property is reversed. The other portions of the judgment are affirmed. The trial court is directed to determine the proportionate interests of the community and Edward's separate estate in the real property known as 133 Hickory Lane in San Mateo, and to determine the valuation of such community interest; to

redetermine the respective rights of the spouses in Mary's pension plan, and if any portion thereof is community property, to determine its valuation; to amend its finding respecting the savings account in the Peninsula Savings and Loan Association to provide that such account is community property; to divide the community property equally between the parties; to make appropriate findings with respect to said determination and redetermination; to amend its findings of fact and conclusions of law in accordance with the views expressed herein; and to enter the appropriate judgment.

Edward is to recover his costs on appeal.

Sims, J., and Elkington, J., concurred.

A petition for a rehearing was denied January 5, 1973, and the opinion was modified to read as printed above. The petitions of both appellants for a hearing by the Supreme Court were denied January 31, 1973.