Filed 2/5/14  McCay v. Turnboo CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| BRIAN M. McCAY,<br><br>    Plaintiff, Cross-defendant and Appellant,<br><br>    v.<br><br>WARREN E. TURNBOO,<br><br>    Defendant, Cross-complainant and Respondent. | H037960<br>(Santa Clara County<br>Super. Ct. No. CV139695) |

Plaintiff Brian M. McCay filed a lawsuit seeking to terminate defendant Warren E. Turnboo's life estate in a house located in Saratoga, California.[1]  Turnboo filed a cross-complaint alleging that he owned a community property interest in the house.  After a court trial, the trial court entered a judgment finding that Turnboo had not forfeited his life estate, ordered McCay to convey to Turnboo a 38.59 percent fee interest in the property, and ordered Turnboo to be reimbursed $49,138 for his separate property contributions to the improvements on the house.  McCay appealed.  For the reasons set forth below, we affirm the judgment.

---

[1] Further references to "the house" are to the property at dispute in this case, which is located on Ronnie Way in Saratoga, California.

FACTUAL AND PROCEDURAL BACKGROUND

*The House*

Helen Turnboo and her first husband, Noel McCay, purchased the house in 1953 for $12,500 by borrowing $11,775 and making a down payment of $725.[2] Turnboo and McCay are stepfather and stepson, and McCay is the son of Helen and Noel. Helen married Turnboo in 1960 after divorcing Noel.

At the time Helen and Turnboo married, the house had appreciated in value, and Helen had an unpaid balance on the mortgage in the amount of approximately $9,648.[3] During the marriage, Helen managed the couple's finances, including their checking accounts. When Turnboo received a paycheck, he would give half of the money to Helen. Helen used this money for food, bills, and mortgage payments. This financial arrangement continued until Helen's death, although the remaining balance on the house's mortgage was fully paid by 1978. Helen never refinanced or encumbered the house with any other mortgages or liens. At some point during his marriage to Helen, Turnboo received approximately $50,000 as an inheritance from his aunt, which he spent making improvements to the house.

*Helen's Trust*

Helen created and signed a trust in 1987. The trust contained a provision granting Turnboo an unconditional life estate in the house. It also contained a provision adding the house to Helen's trust residue upon the termination of Turnboo's life estate. The trust specified that any trust residue was to be distributed to McCay.

In 1999, Helen executed a first amendment to the trust agreement, modifying some of the trust's terms. The amendment added conditions to Turnboo's life estate,

---

[2] For clarity we will refer to Helen Turnboo as "Helen," and Noel McCay as "Noel."

[3] This figure was calculated by one of Turnboo's expert witnesses.

specifying that he would retain a life estate in the house after Helen's death only if he: (1) lives in the house by himself, (2) remains unmarried, and (3) occupies the house on a continual basis. In a separate paragraph from the three numbered conditions, the amendment clarified that Turnboo would be "liable for real estate taxes, maintenance, utilities and insurance."

In 2004, Helen signed another amendment to her 1987 trust. This 2004 amendment stated that Helen confirmed all provisions of her "above dated Trust" and amended one of the trust articles discussing the succession of trustees.

### McCay's Grant Deed

Helen passed away in 2005. In January 2006, McCay recorded a grant deed for the house with the Santa Clara County's Recorder's Office. McCay then transferred title to the house to himself, subject to Turnboo's life estate, and purchased property insurance to protect the structure.

After a while, McCay contacted Turnboo seeking reimbursement for the property insurance premiums he had been paying. Turnboo initially sent McCay a $2,484 check to reimburse him for the premiums paid in 2006 and 2007. Later, Turnboo sent checks to McCay that partially reimbursed him for the premiums paid in 2008, 2009, 2010, and 2011. Turnboo subsequently obtained his own insurance for the house, covering his personal property but not the structure itself.

### The Lawsuit and the Cross-Complaint

In April 2011, McCay filed a fifth amended complaint seeking to terminate Turnboo's life estate due to his failure to pay for insurance.[4] McCay also sought reimbursement for the balance of the unpaid insurance premiums, totaling $1,691.71 plus accrued interest. Turnboo filed a cross-complaint on April 20, 2010, for quiet title and

---

[4] Prior to the commencement of trial, Turnboo demurred to McCay's third cause of action for conversion, which the trial court sustained without leave to amend.

3

imposition of a constructive trust. In part, Turnboo argued that he was entitled to a pro tanto community interest in the house.

### *The Court Trial and Judgment*

The matter proceeded to a court trial. Both parties presented evidence and prepared trial briefs summarizing their arguments. On December 14, 2011, the trial court issued a statement of decision addressing the following issues raised by the parties.

First, the trial court held that paying insurance was not a condition of the life estate. The court also concluded that Turnboo did not intentionally fail to pay for insurance, as it found that Turnboo had mistakenly believed that the insurance he had purchased protected the structure. The court opined that to "displace Mr. Turnboo from his home of 51 years for a mistake that amounted to just over two thousand dollars would be severe and disfavored." Nonetheless, the court ordered Turnboo to reimburse McCay $2,195.63 for the unpaid insurance premiums.

Next, the trial court determined that Turnboo was entitled to a 38.59 percent pro tanto interest in the house since part of the mortgage had been paid down using community funds, relying on this court's decision in *Bono v. Clark* (2002) 103 Cal.App.4th 1409 (*Bono*). Also citing to *Bono*, the trial court calculated that Turnboo was entitled to a $49,138 reimbursement for the improvements made to the house paid for with his separate property.

Lastly, the trial court rejected McCay's argument that the doctrine of laches barred Turnboo's cross-complaint. The trial court concluded that although Turnboo filed his cross-complaint four years after McCay recorded the grant deed, the cross-complaint was filed only one year after McCay filed the lawsuit to terminate Turnboo's life estate. Accordingly, the trial court reasoned that any delay was not unreasonable, and that none of the statutes of limitations relied upon by McCay barred Turnboo's cross-complaint.

4

In December 2011, the trial court entered a judgment consistent with its earlier statement of decision.

## DISCUSSION

McCay raises numerous arguments on appeal: (1) various statutes of limitations and the doctrine of laches bar Turnboo's cross-complaint, (2) the trial court erred in finding that Turnboo was entitled to a pro tanto interest in the house and to a reimbursement for his separate property contribution to the improvements, (3) the trial court erred in finding Turnboo's testimony credible, (4) the trial court failed to address his argument that the house was Helen's sole property and she was therefore entitled to dispose of it as she saw fit, (5) the trial court essentially awarded Turnboo a double recovery as he received reimbursement as well as a pro tanto interest in the house, and (6) the trial court failed to address the issue of merger as Turnboo would now receive a life estate and a fee interest in the house. In addition to refuting McCay's arguments, Turnboo contends that McCay's opening brief is too long and that his notice of appeal was untimely filed. We will address the parties' arguments seriatim.

### 1. *Statute of Limitations*

McCay makes a variety of statute of limitations arguments on appeal, asserting that numerous statutes render Turnboo's cross-complaint untimely. He raised similar arguments below, all of which the trial court rejected. As explained below, we also reject McCay's statute of limitations arguments.

### a. *Standard of Review*

Matters presenting pure questions of law, not involving the resolution of disputed facts, are subject to de novo review. (*Ghirardo v. Antonioli* (1994) 8 Cal.4th 791, 799.) "Mixed questions of law and fact concern the application of [legal rules] to the facts and the consequent determination whether the rule is satisfied." (*Crocker National Bank v. City and County of San Francisco* (1989) 49 Cal.3d 881, 888.) If our resolution of the

5

issues hinges on factual determinations, we will take the factual determinations made by the trial court if they are supported by substantial evidence. (*Bowers v. Bernards* (1984) 150 Cal.App.3d 870, 873-874.)

b. *Forfeiture of the Arguments*

Preliminarily, Turnboo contends that none of McCay's statute of limitations defenses were properly developed before the trial court, and that he has forfeited these arguments on appeal. We agree.

There are two ways to properly plead a statute of limitations defense. The first is to "allege facts showing that the action is barred, and indicating that the lateness of the action is being urged as a defense" and the second is to "plead the specific section and subdivision" of the applicable statute of limitations statute as provided for in Code of Civil Procedure section 458. (*Martin v. Van Bergen* (2012) 209 Cal.App.4th 84, 91, citing to *Brown v. World Church* (1969) 272 Cal.App.2d 684, 691.) McCay failed, in his answer to Turnboo's cross-complaint, to satisfy either of these two methods.[5]

---

[5] In his reply brief, McCay insists that Code of Civil Procedure section 458 would be inapplicable to this case because he is asserting statute of limitations defenses from sections of the Probate Code and Family Code, not the Civil Code. In essence, McCay argues that the Code of Civil Procedure does not apply in actions arising from the Probate Code or Family Code. This claim is without merit. Family Code section 210 provides that "[e]xcept to the extent that any other statute or rules adopted by the Judicial Council provide applicable rules, the rules of practice and procedure applicable to civil actions generally, including the provisions of Title 3a (commencing with Section 391) of Part 2 of the Code of Civil Procedure, apply to, and constitute the rules of practice and procedure in, proceedings under this code." Similarly, Probate Code section 1000 provides that "[e]xcept to the extent that this code provides applicable rules, the rules of practice applicable to civil actions, including discovery proceedings and proceedings under Title 3a (commencing with section 391) of Part 2 of the Code of Civil Procedure, apply to, and constitute the rules of practice in, proceedings under this code. All issues of fact joined in probate proceedings shall be tried in conformity with the rules of practice in civil actions."

Although McCay's answer to Turnboo's cross-complaint included a statute of limitations defense to every one of Turnboo's causes of action, his pleading was deficient. In its entirety, McCay's answer simply states that "[a]s a separate and distinct affirmative defense to Cross-Complainant's cross-complaint, Cross-Complainant's cross-complaint and each and every cause of action therein is barred by the applicable statutes of limitation." The answer does not specify the "applicable statutes of limitation," and does not allege any facts showing that the action is barred. McCay's trial brief does cite to particular statutes of limitation, but there is no case law that suggests raising the defense there instead of in the pleadings is sufficient. (*Martin v. Van Bergen*, *supra*, 209 Cal.App.4th at p. 91.) Since McCay failed to properly plead a statute of limitations defense, he forfeited his arguments below. (*Mysel v. Gross* (1977) 70 Cal.App.3d Supp.10, 15.)

Nonetheless, Turnboo did not contend during the court trial that McCay did not properly plead his statute of limitations defenses, and the trial court made determinations on the statue of limitations issues, holding that McCay's arguments were unmeritorious. Therefore, we will address McCay's statute of limitations arguments, many of which were raised below to the trial court, and will explain why they are without merit.

   c. *Probate Code Section 850*

First, McCay argues that Turnboo should have filed a petition with the probate court under Probate Code section 850, subdivision (a)(2)(C), to contest the characterization of the trust asset upon Helen's death. Probate Code section 850, subdivision (a)(2)(C), provides that a personal representative or any interested person may file a petition with the probate court for an order if the "decedent died in possession of, or holding title to, real or personal property, and the property or some interest therein is claimed to belong to another." McCay contends that the applicable statute of

7

limitations on a cause of action under Probate Code section 850 had expired by the time Turnboo filed his cross-complaint, citing to *Parker v. Walker* (1992) 5 Cal.App.4th 1173.

The statute of limitations is an affirmative defense that must be pled and proven in the trial court. At trial, McCay never argued that Probate Code section 850 barred Turnboo's cross-complaint. Since McCay did not raise this statute of limitations argument at trial, he cannot raise it here for the first time on appeal. (*Union Sugar Co. v. Hollister Estate Co.* (1935) 3 Cal.2d 740, 745.)

d. *Probate Code Section 16061.8, Family Code Section 1101, Code of Civil Procedure Section 366.2, Subdivision (a), Family Code Section 920*

McCay also argues that the statutes of limitations in Probate Code section 16061.8, Family Code section 1101, Code of Civil Procedure section 366.2, subdivision (a), and Family Code section 920 all bar Turnboo's claims. McCay asserted that these statutes of limitations were applicable during the court trial. The trial court rejected his arguments, and so do we.

Probate Code section 16061.8 provides a limitations period for actions brought to contest a trust. Family Code section 1101 discusses the applicable statute of limitations when one spouse impairs community property and breaches his or her fiduciary duty. Code of Civil Procedure section 366.2, subdivision (a), provides a limitations period of one year for actions against a decedent's estate that survive after death. Family Code section 920 sets forth a limitations period for claims for reimbursement when marital property is used to satisfy a debt.

Turnboo's cross-complaint is not an action to contest a trust, does not allege that Helen breached her fiduciary duties to him, is not a cause of action against an estate that survived after her death, and is not a claim for reimbursement for marital property being

8

used to satisfy a debt. Accordingly, none of the limitations periods cited by McCay apply.[6]

## 2. *Doctrine of Laches*

Next, we address McCay's claim that the equitable doctrine of laches bars Turnboo's cross-complaint.

### a. *Standard of Review*

"In cases such as this, where the finding of laches is made after trial, the proper appellate focus is the evidence in support of the finding. . . . We therefore examine the trial record for evidence in support of the trial court's finding of laches." (*Bono*, *supra*, 103 Cal.App.4th at p. 1417.)

### b. *Overview of the Equitable Doctrine of Laches*

The equitable doctrine of laches bars relief to those who fail to exercise their rights in a timely fashion and negatively impacts the opposing party due to their unreasonable delay. (*Bono*, *supra*, 103 Cal.App.4th 1409.) The doctrine of laches is an equitable defense and has its limitations. For one, it is not "applied strictly between near relatives." (*Berniker v. Berniker* (1947) 30 Cal.2d 439, 448.) "More generally, 'laches is not technical and arbitrary and is not designed to punish a plaintiff. It can only be invoked where a refusal would be to permit an unwarranted injustice. Whether or not the doctrine applies depends upon the circumstances of each case.' " (*Bono*, *supra*, at p. 1418.) There are two elements to the defense of laches. First, the plaintiff must have

---

[6] Turnboo counters McCay's arguments by asserting that his cause of action to cancel an instrument and to quiet title under Civil Code section 3412 is not subject to a statute of limitations, citing to *Muktarian v. Barmby* (1965) 63 Cal.2d 558. McCay refuted this contention at length in his reply brief. Regardless, the discussion over *Muktarian* is not relevant to the issues raised on appeal. It is sufficient to determine that none of the statute of limitations arguments advanced by McCay before the trial court and here on appeal have merit.

unreasonably delayed in bringing his or her complaint. (*Ibid*.) Second, the defendant must have been prejudiced due to this delay. (*Ibid*.)

c. *Application of the Doctrine of Laches to Turnboo's Cross-complaint*

In its statement of decision, the trial court held that the doctrine of laches did not bar Turnboo's cross-complaint because McCay had not satisfied either of the elements required for the defense. First, the trial court concluded that there was no unreasonable delay. The court acknowledged that there had been a lapse of four years between the time McCay recorded his grant deed and the time Turnboo filed his cross-complaint. But there was a lapse of only one year between when McCay filed his cause of action seeking to terminate Turnboo's life estate and when Turnboo filed his cross-complaint.

Second, the trial court determined that McCay failed to show he was prejudiced by any delay. The court acknowledged that McCay had testified at trial that he had decided not to fund his 401(k) for the past several years because he had anticipated that he would inherit the house in its entirety. McCay had also insisted that apportioning an interest in the house to Turnboo would significantly impact his retirement plan. However, the trial court concluded that there was no prejudice, as McCay would have an interest in the house only after Turnboo's death, assuming he outlived Turnboo. The court therefore opined that it was premature for McCay to rely on income that could not yet be generated from the house, and that regardless of any apportionment, McCay would still have a "significant interest" in the house should he outlive Turnboo.

The testimony presented at trial supports the trial court's conclusions, although there are areas where the evidence conflicted. McCay testified that Turnboo should have known about Helen's trust, since it was discussed with family members. Turnboo asserted that he was unaware of Helen's intent to leave the house to McCay upon her

10

death.[7] McCay insisted that he changed his retirement strategy because he expected that he would become the sole owner of the house. McCay further testified that he had plans to use the home in the future, and was thinking of either leasing out the house or moving into the house himself and leasing out his current home in Massachusetts.

However, as the trial court noted, McCay's decision not to fully fund his retirement plan was made with the knowledge that Turnboo still retained a life estate in the house. As the trial court reasoned, McCay would only reap the economic benefits of owning the house *after* the termination of Turnboo's life estate. Therefore, McCay did not affirmatively demonstrate that he was prejudiced due to the delay in bringing the cross-complaint, and the trial court did not err in its determination that laches did not bar Turnboo's cross-complaint.

### 3. *The Community Interest in the House*

Next, McCay challenges the trial court's characterization of the house as community property, and further challenges the trial court's order that he transfer a 38.59 percent interest in the house to Turnboo for his share of the community property. For reasons that we explain below, we find no error in the trial court's conclusion that Turnboo possessed a pro tanto interest in the house.

### a. *Standard of Review*

We review the trial court's characterization of the house as community property under the standard of review set forth by this court in *Bono*, *supra*, 103 Cal.App.4th 1409. In *Bono*, we held that " '[q]uestions of fact concern the establishment of historical or physical facts; their resolution is reviewed under the substantial-evidence test.' " (*Id*. at p. 1421.) Therefore, a " 'trial court's finding that a particular item is separate or

---

[7] Turnboo also testified that he believed that Helen may have told her sister of her estate plans, and that later her sister informed Turnboo that Helen intended to leave the home to McCay.

community property is limited to a determination of whether any substantial evidence supports the finding.' " (*Ibid*.) On the other hand, questions of law are subject to our independent review. (*Ibid*.) "In this case, we apply the substantial evidence standard to the trial court's factual findings as to the existence and character of the parties' property. By contrast, the trial court's determination of what legal principles apply is subject to our de novo review." (*Ibid*.)

  b. *The Pro Tanto Interest in the House*

  Upon a spouse's death, there is a rebuttable presumption that property is held as described in the deed. (*Estate of Peterson* (1994) 28 Cal.App.4th 1742, 1747.) Since the house was held solely in Helen's name, there is a rebuttable presumption that it was her separate property. We find that this presumption was properly rebutted since community funds paid down the balance on the house's mortgage after Helen and Turnboo married.

  "When community property is used to reduce the principal balance of a mortgage on one spouse's separate property, the community acquires a pro tanto interest in the property. (*In re Marriage of Moore* (1980) 28 Cal.3d 366, 371-372; *In re Marriage of Marsden* (1982) 130 Cal.App.3d 426, 436-440.) This well-established principle is known as 'the *Moore/Marsden* rule.' (See generally, Hogoboom & King, Cal. Practice Guide: Family Law 2 (The Rutter Group 2002) ¶¶ 8:295 to 8:312, pp. 8-75 to 8-83; 1 Kirkland et al., Cal. Family Law: Practice and Procedure (2d ed. 2002) Division of Specific Property, § 21.03, pp. 21-11 to 21-18.)" (*Bono*, *supra*, 103 Cal.App.4th at pp. 1421-1422.)

  A surviving spouse is entitled to a pro tanto interest in property if he or she contributed community funds to the purchase or improvement of the deceased spouse's separate property. *Estate of Neilson* (1962) 57 Cal.2d 733 discusses this principle. As *Neilson* illustrates, apportioning a pro tanto interest in one spouse's separate property to the other spouse is not limited only to cases involving divorce.

12

However, before a pro tanto interest can be calculated, it must be shown that the property was partially paid with community funds. Substantial evidence supported the trial court's conclusion in this regard. During the trial, Turnboo testified that Helen was having trouble making the mortgage payments prior to their marriage, and was borrowing money from her sister. Turnboo further testified that when he received a paycheck he would give half of his money to Helen. Helen used this money for food, bills, and the mortgage. Community property was therefore used to pay down the mortgage, and Turnboo is entitled to a pro tanto interest in the house.

McCay argues that under *Estate of La Belle* (1949) 93 Cal.App.2d 538, Turnboo's consent to the use of community funds to pay the mortgage negated his interest in the house.[8] McCay's reliance on *La Belle* is misplaced. As articulated by the Second Appellate District in *In re Marriage of Allen* (2002) 96 Cal.App.4th 497, 502, the same rule that was articulated in *La Belle*--that a husband's voluntary improvement of his wife's separate property with community funds is treated as a gift absent evidence to the contrary--reflected a "concern that the husband in control of the community estate will take advantage of his wife." This rule was developed prior to the changes in the law during the 1970s that gave a wife equal control over community assets. (*Ibid*.; Fam. Code, §§ 1100, 1102.) This older rule clearly contradicts the rule set forth in *In re Marriage of Moore*, *supra*, 28 Cal.3d 366 (*Moore*), which held that if community funds were used to make payments on a property purchased by the other spouse before marriage, the community obtained a pro tanto interest. (*Id*. at pp. 371-372.) Therefore, Turnboo's pro tanto interest in the house is not nullified simply because he knew of and consented to the use of community funds to pay the mortgage on the house. (*Ibid*.; *In re Marriage of Gowdy* (1986) 178 Cal.App.3d 1228, 1234.)

---

[8] McCay essentially argues that the common law gift presumption, discussed *post*, applies.

McCay insists, however, that application of the *Moore/Marsden* formula to calculate a pro tanto interest in the house would violate Helen's due process rights to "have her estate obligated, after her death, to a legal apportionment methodology that did not exist when the mortgage on the real property was paid." This argument stems from the fact that *Moore* was decided in 1980, after Helen and Turnboo had paid off the mortgage. (*Moore*, *supra*, 28 Cal.3d 366.) McCay's contention is flawed, as the *Moore* decision did not create new law; it clarified the applicable formula to be utilized when calculating a pro tanto interest. The existence of a pro tanto interest as described in *Moore* was established and discussed in previous cases. (See *Vieux v. Vieux* (1926) 80 Cal.App. 222, 229; *Forbes v. Forbes* (1953) 118 Cal.App.2d 324, 325; *In re Marriage of Jafeman* (1972) 29 Cal.App.3d 244, 257.) Therefore, the trial court did not err when it characterized the house as partly community property. We now address the issue of whether the trial court correctly apportioned the community property interest.

*c. Calculation of the Community's Interest in the House*

McCay challenges the trial court's determination that Turnboo is entitled to a 38.59 percent pro tanto interest in the property in two ways. First, McCay contends that the trial court erroneously relied on the expert testimony provided by one of Turnboo's witnesses, who he contends was not credible. Second, McCay contests the accuracy of the mortgage interest rate that the trial court relied on in its calculation.

1. The Expert Witness Testimony

During trial, Turnboo's expert witness, Thomas Wilson, testified about the method of calculating a pro tanto community interest using the *Moore/Marsden* formula. McCay argues that the trial court should not have accepted Wilson's testimony since it was not credible.[9] Notably, McCay did not move for a motion in limine to exclude Wilson's

_____

[9] Wilson stated at trial that he was a professor of community property law at San Francisco Law School for 26 years, and previously taught community property law at (continued)

14

testimony at trial, nor did he object to the admission of Wilson's testimony before the trial court. McCay did, however, raise questions about the veracity of Wilson's testimony when he cross-examined Wilson during the trial.

McCay essentially urges us to reweigh the evidence and reexamine the credibility of Wilson's testimony, the accuracy of which he already criticized at trial. However, that is not the role of this court; we only decide if substantial evidence supports the trial court's factual findings. (*Eidsmore v. RBB, Inc.* (1994) 25 Cal.App.4th 189, 195.) McCay's argument on the credibility of the witness therefore fails, but we will address his related argument that the trial court erroneously concluded that the interest rate for the mortgage was 4.5 percent.

### 2. The Interest Rate

In its statement of decision, the trial court concluded that Helen and Noel had acquired a 25-year mortgage with a 4.5 percent interest rate when they initially purchased the house. When reviewing a trial court's independent factual determination, we employ a substantial evidence standard of review to determine whether there is any evidence, contradicted or uncontradicted, to support the trial court's conclusions. (*Eidsmore v. RBB, Inc.*, *supra*, 25 Cal.App.4th at p. 195.)

At trial, Wilson testified that he determined the interest rate for the mortgage was 4.5 percent based on the house's deed of trust. Wilson asserted that the deed of trust memorialized the terms of the original loan. The deed of trust, admitted as an exhibit at trial, did in fact reflect that the interest rate was 4.5 percent per annum. However, this interest rate figure did not go unchallenged. McCay questioned Wilson during the trial about why he used a 4.5 percent interest rate to calculate the pro tanto interest in the

Golden Gate Law School. At the time, Wilson was employed in private practice, working on family law and *Moore/Marsden* issues. The court qualified him as an expert in the *Moore/Marsden* formula.

15

Saratoga property, and asked him about his experience with reading deeds of trusts. McCay argued that Wilson had no basis for his conclusion about the value of the interest rate. In his closing trial briefs, McCay again reiterated his belief that Wilson erroneously based his calculations on a 4.5 percent interest rate.

However, given Wilson's testimony that the deed of trust memorialized the original terms of the loan and because the deed of trust is in the record and reflects a 4.5 percent interest rate, we conclude that substantial evidence supported the trial court's factual finding that the mortgage was subject to a 4.5 percent interest rate.

### 3. The Application of the *Moore/Marsden* Formula

Next, we review de novo the trial court's application of the *Moore/Marsden* formula. (*Bono*, *supra*, 103 Cal.App.4th at p. 1421.) The trial court appears to have relied on the calculation advanced by Wilson during trial. Wilson calculated the community pro tanto interest by determining the amount of the loan (the balance left in 1960, when Helen and Turnboo married) that was paid using community funds. This figure, estimated at $9,648, was then divided by the original purchase price of $12,500 to come to a percentage of 77.18 percent. This meant that 77.18 percent of the Saratoga property was community property. Dividing 77.18 percent by two yielded a 38.59 percent community property interest each for Helen and Turnboo. This figure was calculated using the *Moore/Marsden* formula articulated in *In re Marriage of Frick* (1986) 181 Cal.App.3d 997, 1008. Since Wilson's calculation followed this proscribed formula, the trial court did not err in its conclusion that Turnboo's pro tanto community interest in the property was 38.59 percent.

### 4. *Reimbursement for Turnboo's Separate Property Contributions*

In addition, McCay challenges the trial court's order granting Turnboo a $49,138 reimbursement for his separate property contributions to the house. McCay argues that in ordering reimbursement, the trial court erroneously relied on Family Code section 2640,

16

which he contends is applicable only in divorce proceedings.[10]  As this is a question of law, we review this issue de novo and preliminarily note that McCay's argument mischaracterizes the trial court's judgment.  In its statement of decision, the court asserted that reimbursement was proper as set forth in *Bono*, *supra*, 103 Cal.App.4th 1409, not Family Code section 2640.  However, the trial court's reliance on *Bono* was partially misplaced.  *Bono* held that a surviving spouse may be entitled to reimbursement for his or her share of *community property* that is used to improve the other spouse's *separate property*.  (*Bono*, *supra*, at pp. 1423-1425.)  Here, the court ordered reimbursement to Turnboo for his *separate property* contributions to Helen's *separate property*.  Nevertheless, even though the holding in *Bono* is not entirely on point, we find its reasoning persuasive.

In its analysis of the reimbursement issue, *Bono* did not rely on Family Code section 2640, which does not discuss reimbursement for community property contributions to separate property.  Instead, *Bono* relied on the *Moore/Marsden* rule and the Third Appellate District's decision in *In re Marriage of Wolfe* (2001) 91 Cal.App.4th 962, 973 (*Wolfe*).  In *Wolfe*, a wife sought reimbursement for her share of the community funds used to install a drip irrigation system on her husband's separate property.  (*Id.* at p. 965.)  The wife prevailed at trial and the husband appealed.  The husband argued that the general rule for expenditures of community property on separate property was that "[a]bsent an agreement to the contrary, the use of community funds to improve the separate property of one spouse does not alter the character of separate property."  (*Id.* at p. 966.)  Prior to the decision in *Wolfe*, courts had typically presumed under the common law gift presumption that " 'the traditional rule of law which denies either apportionment or reimbursement for community contribution[s] to a wife's separate property [had] not

_____

[10] McCay does not dispute the trial court's determination that Turnboo's separate property inheritance funded the improvements made to the house.

17

been overruled.' " (*Ibid.*, quoting *In re Marriage of Camire* (1980) 105 Cal.App.3d 859, 867.)

The *Wolfe* court ultimately upheld the trial court's order for reimbursement after outlining the history of the gift presumption--a presumption that oddly developed after earlier cases discussed a right to reimbursement. The first few cases to address a right to reimbursement were *Smith v. Smith* (1859) 12 Cal. 216 (*Smith*) and *Noe v. Card* (1860) 14 Cal. 576 (*Noe*). In both *Smith* and *Noe*, the California Supreme Court "recognized a general rule of reimbursement, emanating from Spanish law, and set forth in the case law of Texas and Louisiana, which was not limited to the husband's use of community funds to improve his own property." (*Wolfe*, *supra*, 91 Cal.App.4th at p. 968.)

However, this general rule for reimbursement narrowed over time. Cases decided in the years following *Smith* and *Noe*, including *Dunn v. Mullan* (1931) 211 Cal. 583 (*Dunn*), created the gift presumption. *Dunn*, a case arising from a procedural posture similar to the one we are presented with here, was an action brought by the administrator of an estate to quiet title to several parcels of property that were held in the name of Lyons (the decedent) and his wife. (*Id*. at p. 585.) In part, the administrator argued that Lyons' use of community funds to make improvements on his wife's separate property created a community interest. (*Id*. at p. 588.) The *Dunn* court held that the construction of the house did not alter the title of his wife's separate property and therefore did not give rise to a lien. (*Id*. at p. 589.)

In dicta, the *Dunn* court went on to express its conclusion that "the same reasoning which warrants a presumption that a husband did not intend by the expenditure of community funds for the benefit of his wife's separate property to create a lien upon said property compels the conclusion that he did not expect repayment for the community funds expended by him to improve his wife's separate property or to relieve it of an encumbrance." (*Dunn*, *supra*, 211 Cal. at p. 589.) Essentially, the *Dunn* court articulated

18

that if the husband used community property to improve his wife's property, it was presumed to be a gift and he would not be entitled to a lien or reimbursement.[11] Later, the gift presumption articulated in *Dunn* "became gospel as Courts of Appeal adopted it as the ratio decidendi without any thoughtful examination or discussion." (*Wolfe*, *supra*, 91 Cal.App.4th at p. 972.)

In the years following *Dunn*, courts applied the gift presumption in cases involving divorce and in cases involving the division of community property interests upon the death of a spouse. (See, e.g., *Estate of Bernatas* (1958) 162 Cal.App.2d 693 [finding that husband was not entitled to any interest in wife's separate property under the gift presumption]; *Estate of Inman* (1957) 148 Cal.App.2d 952 [rejecting surviving husband's lien for reimbursement for improvements made using community funds on decedent wife's separate property under the gift presumption]; *Estate of Wooten* (1944) 64 Cal.App.2d 96 [holding that consenting wife was not entitled to lien for reimbursement for community funds used to repair and make additions to deceased husband's separate property].) Courts also applied the gift presumption to bar reimbursement for a spouse's separate property contributions to community and separate property, not just community property contributions to community and separate property.

---

[11] The gift presumption outlined in *Dunn* contrasted with the development of a rule that if a husband used community property to pay for improvements on *his* separate property without the wife's consent, the wife was entitled to a reimbursement. (*Wheeland v. Rodgers* (1942) 20 Cal.2d 218, 222.) This rule existed because prior to changes to the Family Code granting wives equal control over community assets, husbands were the sole managers of community property. Therefore, "to permit [the husband] to use with impunity the community funds to improve his separate property [without the wife's consent] would be a constructive fraud upon the wife." (*Ibid.*) This general rule for reimbursement was applied in various cases, including in *Estate of Turner* (1939) 35 Cal.App.2d 576, 580, which held that a surviving wife of an intestate decedent was entitled to a reimbursement for the community property funds used to protect her late husband's separate property.

(See *In re Marriage of Lucas* (1980) 27 Cal.3d 808, superseded by statute as stated in *In re Marriage of Walrath* (1998) 17 Cal.4th 907, 914.)

The *Wolfe* court, in abrogating the *Dunn* gift presumption and affirming the trial court's order for reimbursement, concluded that there was "little logic in a rule that presumes an unconditional gift when one spouse uses community funds to improve the other spouse's separate property." (*Wolfe*, *supra*, 91 Cal.App.4th at p. 972.) *Bono* relied on this reasoning for its conclusion that a spouse is entitled to either a reimbursement for their share of community funds used to improve the deceased spouse's property, or a pro tanto interest in the separate property under the *Moore/Marsden* rule. (*Bono*, *supra*, 103 Cal.App.4th at pp. 1423-1425.)

*Bono*, as previously discussed, is distinguishable from this instant case, as *Bono* discusses reimbursement for community expenditures on a spouse's separate property. However, it is notable that *Bono* was not a marital dissolution proceeding, as it involved one spouse's civil suit for a determination of community property interests after the death of the other spouse. A marital dissolution proceeding was pending at the time the husband died in *Bono*, but no judgment of dissolution had been entered. (*Bono*, *supra*, 103 Cal.App.4th at p. 1415.) Since the husband died before judgment of dissolution was entered, the family court was deprived of the jurisdiction to make orders with respect to the division of property.[12] (*Allen*, *supra*, 8 Cal.App.4th at p. 1229.) Therefore, the *Bono* court's determination of the surviving spouse's potential right to reimbursement was not governed by the principles underlying a division of a community estate upon divorce.

It follows that McCay's contention that reimbursement is limited to divorce cases is flawed. *Bono* was not a marital dissolution proceeding, and the court there rightfully

---

[12] In contrast, if a spouse dies after a judgment of dissolution has been entered, the family court will retain jurisdiction to decide any of the reserved issues. (*In re Marriage of Allen* (1992) 8 Cal.App.4th 1225, 1229 (*Allen*).)

held that the *Bono* wife may be entitled to a reimbursement of her share of the community funds used to improve her husband's separate property. Under the same principles, Turnboo is entitled to a reimbursement for his separate property contributions to Helen's separate property. If we held that reimbursement is available only when spouses divorce one another, we would create an imbalance--the *Dunn* gift presumption, which had been previously applied by courts in property divisions commenced upon divorce *and* upon the death of a spouse, would only be abrogated in one type of proceeding.

Furthermore, holding that reimbursement is barred when a spouse spends separate property improving the other spouse's separate property would produce an anomalous situation. This would mean that as set forth in *Bono*, upon a spouse's death, the surviving spouse would be entitled to his or her share of the community funds spent improving the deceased spouse's separate property but would not be entitled to reimbursement for any separate property contributions. We would essentially be limiting reimbursement to those cases in which community funds are used to improve property, placing community-funded improvements on a different footing than separate property-funded improvements, with little logic for this distinction.

It is true that the language of Family Code section 2640, subdivision (b), which authorizes reimbursement for separate property funds used to improve community property, is ambiguous--the subdivision starts with specifying that it is applicable "[i]n the division of the community estate under this division." Division 7 of the Family Code, in which Family Code section 2640 appears, contains to property division principles applicable in divorce and separation actions. However, Family Code section 2640, subdivision (c), which discusses reimbursement for separate property contributions to another spouse's separate property, does not contain similar language. Furthermore, Family Code section 2640 does not expressly state that its reimbursement rules are meant

21

to apply *only* in dissolution proceedings.  There is also no case law that specifies that Family Code section 2640 may only apply in dissolution proceedings.

Hence, we will not construe that the Legislature intended the language in Family Code section 2640 to abrogate a surviving spouse's right to reimbursement for separate property spent on improving a deceased spouse's separate property.  The common law right to a reimbursement, as discussed in *Smith* and *Noe*, existed long before the enactment of Family Code section 2640.  In later cases, reimbursement was only barred because courts applied the now-defunct gift presumption as articulated in *Dunn*.  As this gift presumption is no longer followed by California courts, we fail to see why reimbursement should be unavailable to an individual in Turnboo's situation.  We therefore conclude that Turnboo is entitled to a reimbursement for his separate property contribution to the improvements to the house.[13]

In a separate argument, McCay claims that Turnboo received a double recovery when the trial court awarded Turnboo both a pro tanto interest in the property as well as a reimbursement for his separate property contributions.  McCay mischaracterizes the nature of a reimbursement under the circumstances.  " 'A reimbursement award comes off the top of the community property item in question before the [community property]

---

[13] McCay also argues that the right of reimbursement under Family Code section 2640 is not vested until a state court orders the division of community property, citing to *In re Mantle* (9th Cir. 1998) 153 F.3d 1082 (*Mantle*).  In *Mantle* the Ninth Circuit held that "all community property not yet divided by a state court at the time of the bankruptcy filing is property of the bankruptcy estate." (*Id*. at p. 1085.)  It further held that the wife retained her right to a reimbursement under Family Code section 2640 for her separate property contribution to the community property, but that "this separate property interest does not render the sale proceeds her separate property prior to division by the superior court." (*Mantle*, *supra*, at p. 1086.)  Unlike *Mantle*, the case here does not involve the sale of a community property home during a bankruptcy.  *Mantle* simply concludes that there is no *vested* separate property interest in the house that can protect that portion of the estate from creditors or bankruptcy, prior to a state court ordering reimbursement.

interest in that property is divided.' " (*In re Marriage of Walrath*, *supra*, 17 Cal.4th at p. 913.)  Accordingly, Turnboo did not receive a double recovery even though the trial court apportioned him a community property interest in the house and awarded him a reimbursement for his separate property contribution.  The trial court's order for reimbursement was therefore appropriate.

### 5. *Turnboo's Credibility*

McCay also challenges Turnboo's credibility as a witness, and argues that the trial court's failure to address Turnboo's "faulty testimony" was an abuse of discretion.  To underscore his point, McCay points to portions of Turnboo's testimony in his opening brief that he finds to be unreliable or contradictory.  We find McCay's argument on this point to be without merit, as we do not review the credibility of witnesses on appeal.  (*In re Marriage of Balcof* (2006) 141 Cal.App.4th 1509, 1531.)  The trial court was in the best position to evaluate Turnboo's mental state and his allegedly unreliable testimony, and we will not substitute our judgment for the trial court's.

### 6. *Helen's Ability to Dispose of the House*

McCay also argues that the trial court did not address his argument that the house was Helen's separate property, and that she was therefore entitled to dispose of it as she saw fit.  While Helen may validly dispose of any of her separate property as she wished, the same cannot be said of community property.  Upon the death of a married individual, one-half of the community property belongs to the surviving spouse.  (Prob. Code, § 100.)  Since the trial court correctly determined that the house was partly community property, Helen was only able to dispose of her half of the community property interest and her separate property interest in the house.  McCay's arguments on this point are therefore without merit.

### 7. *Merger of the Life Estate with the Community Property Interest*

In his opening brief, McCay argues that the trial court erred in granting Turnboo a fee interest in the house without terminating his life estate, since a life estate merges into the fee interest. He does not further develop this argument, and provides only a reference to an identical argument in his objection to the trial court's statement of decision, which suffers from the same deficiencies as the argument raised on appeal. In the objection, McCay simply stated that the "court fail[ed] to address the factual and legal issue of the doctrine of merger between the life estate and fee title. If Mr. Turnboo in fact were to obtain a 38.59% *pro tanto* community interest in the [Saratoga property], then he would have a 38.59% 'undivided interest in the whole.' Having an undivided interest in the whole property should merge with his life estate and the life estate must terminate." McCay does not offer any legal citations or argument to support this claim in either the objection or in his brief.

"The appellate court is not required to search the record on its own seeking error." (*Del Real v. City of Riverside* (2002) 95 Cal.App.4th 761, 768.) "When an appellant fails to raise a point, or asserts it but fails to support it with reasoned argument and citations to authority, we treat the point as waived." (*Benach v. County of Los Angeles* (2007) 149 Cal.App.4th 836, 852.) Since McCay has failed to support this argument, he has waived it on appeal.

### 8. *Length of McCay's Opening Brief*

Turnboo argues that McCay's 50-page opening brief is too long because it contravenes the requirements set forth in California Rules of Court, rule 8.204(c)(4). Preliminarily, it appears that Turnboo erred in his citation to the California Rules of Court. California Rules of Court, rule 8.204(c)(4), states that "[a] combined brief in an appeal governed by rule 8.216 must not exceed double the limits stated in [rule 8.204(c)](1) or (2)." It appears that Turnboo likely intended to cite to California Rules of

24

Court, rule 8.204(c)(2), which provides that a brief *produced on a typewriter* may not exceed 50 pages. This rule is inapplicable as McCay's brief was produced on a computer, not a typewriter. Additionally, McCay's opening brief, at 12,669 words, is within the 14,000 word limit for briefs produced on a computer under California Rules of Court, rule 8.204(c)(1).

### 9. *Timeliness of McCay's Notice of Appeal*

Lastly, Turnboo argues that McCay's notice of appeal was untimely because the notice was filed more than 60 days had elapsed from December 14, 2011, the date when the clerk of the superior court served a file-stamped copy of the judgment along with a proof of service. This is the same contention that was raised in his motion to dismiss, which we denied on May 17, 2012. Our ruling disposed of Turnboo's argument on this point.

**DISPOSITION**

The judgment is affirmed.  Turnboo is entitled to his costs on appeal.

_____
                                                            Premo, J.

WE CONCUR:

_____
        Rushing, P.J.

_____
        Elia, J.

26